IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| RODERICK HENDERSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:24-CV-841-RP |
| | § | |
| ONCOR ELECTRIC DELIVERY | § | |
| COMPANY, LLC, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the Court is Defendant Oncor Electric Delivery Company, LLC's ("Oncor") Motion for Summary Judgment, (Dkt. 16), and all related briefing. Having considered the parties' submissions, the record, and the applicable law, the Court will grant Oncor's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff Roderick Henderson ("Henderson") brings race discrimination and retaliation claims under 42 U.S.C. § 1981 ("1981" or "Section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII") as well as claims under the Americans with Disabilities Act ("ADA") against his former employer Oncor. (Compl., Dkt. 1, at 6–11). Henderson is an African American male who was hired by Oncor as a Design Associate on March 1, 2022. (Declaration of Roderick Henderson ("Henderson Decl."), Dkt. 18-1, at App. 002). In this role, Henderson's responsibilities included "developing designs and preparing estimates to ensure quality construction of electric distribution system additions, expansions, and modifications in accordance with Oncor's policies and accepted standards." (Affidavit of Monica Knight ("Knight Aff."), Dkt. 17-1, at App. 002–003)). Henderson worked out of the Hutto service center, which was part of Oncor's Killeen, Round Rock, and

1

Temple Region ("KRT"). (Deposition of Elizabeth Barrett ("Barrett Dep."), Dkt. 17-1, at App. 220–221).

At the beginning of Henderson's employment, Lauren Simpson served as Plaintiff's supervisor. (Henderson Dep., Dkt. 18-1, at App. 025–026). Henderson also claims he reported to Senior Manager Chad Blankenship. (*Id.*). In January 2023, the Senior Manager of Design for the Southeast Region, Elizabeth Barrett, became Henderson's supervisor. (*Id.* at App. 002). Henderson purports that around this time he "began requesting assistance with his workload, including training, mentoring, and shadowing, but Barrett and Blankenship denied Henderson's requests and told him to 'stay in his lane' when he suggested improvements." (*Id.*).

Oncor alleges that on or about April 13, 2023, Barrett reached out to Henderson to ask for an update on a project, (Barrett Dep., Dkt. 17-1, at App. 229–230), and she called, left a voicemail, and texted Henderson but she did not receive a response, (*id.*; Knight Aff., Dkt. 17-1, at App. 002–003; Ex. 1-K, Dkt. 17-1, at App. 068–069). When Barrett reached out again on the morning of April 14, 2023, (Barrett Dep., Dkt. 17-1, at App. 230), Henderson "again complained to Barrett about issues involving his work conditions" over WebEx. (Henderson Decl., Dkt. 18-1, at App. 003). Then, on April 19, 2023, Barrett, Blakenship, and Antonella Guadagno, an Oncor Human Resources Business Partner, met with Henderson to discuss his WebEx complaint. (Knight Aff., Dkt. 17-1, at App. 002–003). Henderson alleges that at that meeting, he "questioned preferential treatment given to family members of management, 'people that look like ya'll versus me as a black employee[,]' and feelings of isolation from his group 'as a difficult black character.'" (Henderson Decl., Dkt. 18-1, at App. 003). Henderson further asserts that "Blankenship and Barrett responded with hostility, dismissed Henderson's complaints, told him his feelings were not valid, and that his demeanor needed to change." (*Id.*).

Oncor refutes Henderson's allegation and instead maintains that "[a]t no time during the April 19th meeting or any time thereafter did Plaintiff make any complaints of discrimination or alleged unlawful conduct." (Mot. Summ. J., Dkt. 16, at 7). Rather, Oncor contends that "during the meeting, [Henderson] reported feeling overwhelmed by his workload and requested more administrative support, expressing frustrating over the lack of action regarding workload." (Knight Aff., Dkt. 17-1, at App. 002–003). Henderson claims that Guadagno called him a week after the meeting to check in; Henderson let her know that "nothing had changed and everything was the same"; and Guadagno "did not respond to "Henderson's renewed complaint." (Henderson Decl., Dkt. 18-1, at App. 003).

From Thursday, May 11 to Monday, May 15, 2023, Henderson traveled to Costa Rica to attend a friend's wedding. (*Id.*). Below the Court briefly summarizes each party's description of Henderson's trip and the events that followed.

The parties dispute whether Henderson received supervisor approval, as required by Oncor, for his trip. Oncor maintains that Henderson did not inform his supervisor Barrett of his travel plans and "did not obtain her approval to be out of the office (or to work remotely) on those dates." (Barrett Dep., Dkt. 17-1, at App. 240, 245). In his Response, Henderson asserts that "[b]efore going on vacation, Henderson spoke with Barrett who explicitly approved his vacation dates" and in addition, Henderson spoke with his co-worker James Chrisman about his vacation, "as Chrisman would be covering Henderson's duties during this time." (Henderson Decl., Dkt. 18-1, at App. 003). And, "Henderson [claims that he] also communicated his vacation dates with others in Hutto such that it was widely known that he would be out of the country and Chrisman." (*Id.* at App. 003–004). In its Reply, Oncor cites to two emails from Henderson to Oncor employees in which he "acknowledged that he 'proceeded with a three-day vacation without direct supervisor approval' and conceded that 'his lack of action' jeopardized his career at Oncor." (Reply, Dkt. 19, at 8 (citing

Knight Aff., Dkt. 17-1, at App. 022–003; Ex. 1-S, Dkt. 17-1, at App. 099–100; Ex. 1-2, Dkt. 17-1, at App. 107–108)).

Henderson contends that "[w]hile Oncor did not implement a formal vacation policy at the KRT service center, Henderson nonetheless understood that he should also send a Microsoft Outlook calendar invitation to Barrett and an administrative assistant for his vacation to Costa Rica." (Resp., Dkt. 18, at 9). "Henderson recalls creating a calendar invite for his Costa Rica vacation, including Barrett and the KRT group's administrative assistant as attendees, and sending the invitation." (Henderson Decl., Dkt. 18-1, at App. 004). The parties do not dispute that Henderson did not send that calendar invite to Barrett or any other Oncor employees. (Knight Aff., Dkt. 17-1, at 002–003; Costa Rica Calendar Invite, Ex. 1-M to Mot. Summ. J., Dkt. 17-1, at App. 073; Henderson Decl., Dkt. 18-1, at App. 004).

"In addition, Henderson recalls speaking with Barrett the morning of his flight to Costa Rica after she reached out to him and telling Barrett that he was getting on a plane and would see her upon his return." (Henderson Decl., Dkt. 18-1, at App. 004 (quotations removed)). Oncor asserts that it did not find any evidence of that call and maintains that "the phone records for [Henderson's] company phone [did] not show any outgoing calls on that date." (Knight Aff., Dkt. 17-1, at App. 002–003, 007). Additionally, according to Oncor, "[o]n May 12, 2023, [] Barrett attempted to contact [Henderson] but was unable to reach him." (Barrett Dep., Dkt. 17-1, at App. 239–241). Oncor's Work Hours and Pay Policy requires that an employee gain "approval of [their] supervisor" in order to receive an excused absence with pay for a vacation. (Oncor's Work Hours and Pay Policy, Ex. 1-D to Mot. Summ J., Dkt. 17-1, at App. 038).

On May 16, 2023, after Henderson returned to the office, Monica Knight, Oncor's Senior Manager of Employee Relations, Barrett, and Melinda Carson, a Design Supervisor, met with Henderson to discuss his absence from work from May 11 through May 15. (Knight Aff., Dkt. 17-1,

at App. 002–003). During that meeting, Henderson claimed he had performed offline work because he was having "network issues," and he provided Barrett with his company cell phone to review text messages. (Henderson Dep., Dkt. 18-1, at App. 037; Henderson Decl., Dkt. 18-1, at App. 004–005). As a result of that review of Henderson's company cell phone plus the full investigation into Henderson's vacation that ensued afterwards, Oncor found that neither Henderson's cell phone nor laptop demonstrated that he performed any offline work during his vacation. (Knight Aff., Dkt. 17-1, at App. 002–003, 006–007).

At the conclusion of the May 16, 2023 meeting, Oncor placed Henderson on "crisis suspension." (Knight Aff., Dkt. 17-1, at App. 002–003, 005–006). Oncor contends "[t]his action was taken because, after reviewing his company phone, Oncor suspected that [Henderson] had provided false and misleading information during the meeting; specifically, there was no evidence on his phone indicating that he had worked on text message responses or other work in Costa Rica as he had claimed."[1] (Knight Aff., Dkt. 17-1, at App. 005–006).

Knight led the investigation into Henderson's work activities while in Costa Rica. (*Id.* at App. 006; Barrett Dep., Dkt. 17-1, at App. 247). According to Oncor, "[t]he investigation revealed that no emails, calls, or text messages were sent or made from [Henderson's] company devices between May 12 and May 15, 2023, and there was no evidence of user activity or VPN access from Costa Rica during that period." (Knight Aff., Dkt. 17-1, at App. 002–003, 006). Therefore,

---

[1] Oncor presents the following details of certain aspects of its policies, as is relevant here: "Under Oncor's Code of Conduct, employees are prohibited from providing misleading or false information to any Oncor representative during company investigations. In accordance with Oncor's Discipline policy, employees who are untruthful or misrepresent information during an investigation may be crisis suspended with no prior warning and may be terminated or otherwise disciplined for a first-time offense. Additionally, under Oncor's Work Hours and Pay policy, if an employee is going to be absent from work, they must notify their supervisor as early as possible." (Knight Aff., Dkt. 17-1, at App. 002–003; Oncor's Code of Conduct, Ex. 1-B to Mot. Summ. J., Dkt. 17-1, at App. 016–032; Oncor's Discipline Policy, Ex. 1-C to Mot. Summ. J., Dkt. 17-1, at App. 033–037; Oncor's Work Hours and Pay Policy, Ex. 1-D to Mot. Summ. J., Dkt. 17-1, at App. 038–039).

"[b]ecause the investigation revealed that [Henderson] had taken vacation without supervisor approval in violation of Oncor's Work Hours and Pay policy and that [Henderson] provided false information during a company investigation in violation of Oncor's Code of Conduct," Oncor terminated Henderson's employment on June 2, 2023." (*Id.* at App. 002–003, 007–008).

On June 6, 2023, Henderson appealed his termination decision under Oncor's Employee Problem Resolution ("EPR") policy. (*Id.* at App. 002–003). Oncor states that "[d]uring the meeting, [Henderson] once again claimed he had worked while in Costa Rica, but he did not provide any new information or evidence to substantiate that claim or that would have affected the investigation or required the committee to remand the matter for further review;" therefore, "after meeting with [Henderson], reviewing the relevant documentation, and reviewing the investigation process, the EPR committee upheld the decision to terminate [Henderson] employment." (Knight Aff., Dkt. 17-1, at App. 002–003).

Henderson alleges that he "timely filed a charge of discrimination against [Oncor] which was dual filed with the Texas Workforce Commission Civil Rights Division and the Equal Employment Opportunity Commission ('EEOC') pursuant to those agencies' work sharing agreement." (Compl., Dkt. 1, at 2). Henderson further contends that the EEOC issued a Notice of Right to Sue on April 30, 2024, and he filed this action within ninety days of receipt of that notice. (*Id.*).

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560

6

F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000).

### III. DISCUSSION

At the outset, the Court delineates which claims are actively disputed at the time of the Court's ruling. In Oncor's Motion for Summary Judgment, (Dkt. 16), Oncor moves for the Court to grant it summary judgment on Henderson's race discrimination, retaliation, and ADA claims. In his response, Henderson voluntarily dismissed his ADA claims. (Resp., Dkt. 18, at 4 n.1). As such, the Court only evaluates Henderson's race discrimination and retaliation claims and will grant Oncor's

motion for summary judgment on Henderson's ADA claims in light of Henderson's non-opposition. *See Hill v. Concho Res., Inc.*, 634 F. Supp. 3d 359, 362 (W.D. Tex. 2022) (granting summary judgment to the defendants on claims that the plaintiff sought to withdraw in his response to the defendants' summary judgment motion); *see also Boutte v. Beaumont Indep. Sch. Dist.*, No. 1:23-CV-392, 2024 WL 3878422, at *5 (E.D. Tex. Aug. 19, 2024) ("Where a plaintiff withdraws or abandons her claim in response to a defendant's motion for summary judgment, courts generally grant summary judgment to the defendant on the abandoned claim.").

### A. Race Discrimination Claims

Henderson brings race discrimination claims against Oncor under Title VII and § 1981. (Compl., Dkt. 1, at 6–8). The Fifth Circuit has consistently held that "race discrimination claims brought pursuant to section 1981 are governed by the same evidentiary framework applicable to employment discrimination claims under Title VII." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n.7 (5th Cir. 2004); *see also Jones v. Robinson Prop. Group*, 427 F.3d 987, 992 (5th Cir. 2005) ("[T]he analysis under both [Title VII and § 1981] [is] identical, the only substantive differences between the two statutes being their respective statute of limitations and the requirement under Title VII that the employee exhaust administrative remedies.") (citations omitted). Because the same analysis applies to both statutes, the court will consider these claims together under the Title VII evidentiary framework.

To survive summary judgment, a Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion, which may be established via direct or circumstantial evidence. *Harris v. Drax Biomass Inc.*, 813 F. App'x 945, 947 (5th Cir. 2020) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977)). Because Henderson attempts to prove race-based discrimination under Title VII through circumstantial evidence, the Court must evaluate his claims under the burden-shifting framework set

out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by the Fifth Circuit. *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015).

"Under the modified *McDonnell Douglas* approach, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411–12 (5th Cir. 2007). To establish his prima facie case, Henderson must show that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside of the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably." *Standley v. Rogers*, 680 F. App'x 326, 327 (5th Cir. 2017) (quoting *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004)).

Oncor contends that Henderson has failed to establish a *prima facie* case of race discrimination because "he cannot identify any similarly situated employees who were treated more favorably than he was." (Mot. Summ. J., Dkt. 16, at 13). Henderson agrees that this is the only area of dispute concerning his alleged case of *prima facie* discrimination. (Resp., Dkt. 18, at 4). The "similarly situated" prong of establishing a *prima facie* case of discrimination or disparate treatment requires that the plaintiff identify a fellow employee as a "comparator" who was outside of the plaintiff's protected group and was treated more favorably "under nearly identical circumstances." *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)).

"The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been nearly identical to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the employees are not similarly situated for the purposes of an employment discrimination analysis."

*Id.* (emphasis in original) (citations omitted).

Here, Oncor asserts that the comparators Henderson points to did not engage in similar misconduct to Henderson and held different titles and roles at the company. Henderson contends that the following Caucasian employees were treated more favorably than he was—Mark Russell, Lance Brem, and Cassidy Diaz. (Resp., Dkt. 18, at 13 (citing Henderson Dep., Dkt. 18-1, at App. 034–0.36; Henderson Decl., Dkt. 18-1, at App. 005)). Henderson argues that each of these comparators "were in the KRT service center, had their employment status determined by Barrett, and performed similar design roles as Henderson in the KRT service center." (*Id.*). Further, Henderson describes that "Brem, Diaz, and Russell likewise engaged in conduct that violated Oncor policies involving attendance or integrity but received progressive discipline or no discipline at all unlike Henderson." (*Id.* at 14). Specifically, Henderson states:

"Brem (Caucasian, Designer) was absent from work without permission for an entire month, a clear violation of the Work Hours and Pay Policy cited by Oncor in its decision to terminate Henderson. Oncor did not terminate Brem—whose unapproved extended absence directly parallels Henderson's alleged unapproved vacation of five days—and instead placed him on progressive discipline. Oncor similarly implemented progressive discipline against Diaz (Caucasian, Design Associate) instead of termination, despite her arrest causing her to fail to report for work without prior approval. And despite providing Oncor with deliberately false and misleading information about a mistake that caused significant financial loss, Oncor took no action against Russell (Caucasian, Senior Designer)."

(*Id.* (citations omitted)). A such, Henderson asserts that "[t]hese comparators are sufficiently similar under Fifth Circuit precedent, as they shared the same supervisory chain as Henderson, held similar

10

positions, and committed violations based on conduct similar to that alleged against Henderson that involved unapproved absences or misrepresentations that affected business operations." (*Id.* at 14–15).

Oncor responds that "[Henderson] has not explained the job duties of a Designer or a Senior Designer, nor has [Henderson] explained how their job duties were similar to a Design Associate to render those positions sufficient comparators." (Reply, Dkt. 19, at 4). Oncor further contends:

> "Oncor denies that Mr. Brem and Mr. Russell engaged in the alleged misconduct. However, even assuming they did, [Henderson] alleges that each of the alleged comparators either engaged in an attendance violation or an integrity violation, but not both contemporaneously. Conversely, [Henderson] failed to adhere to both the Work Hours and Pay Policy and the Code of Conduct due to taking vacation time without approval and furnishing inaccurate information during a company investigation related to this conduct. **The combination of these infractions represents a more serious breach of company policy.** This cumulative misconduct sets [Henderson]'s situation apart from those of Mr. Brem, Ms. Diaz, and Mr. Russell, and served as a key aggravating factor. As a result, the discipline imposed on [Henderson] was warranted given the more serious nature of his actions."

(*Id.* at 5) (emphasis added).

The Court finds that Henderson has not established that the conduct of the three comparators he identifies is "nearly identical" to his conduct. *See Lee*, 574 F.3d at 260 (quoting *Freeman v. Tex. Dep't of Crim. Just.*, 369 F.3d 854, 860 (5th Cir. 2004)). Henderson allegedly violated both Oncor's Work Hours and Pay Policy *and* the Code of Conduct, whereas for each of his identified comparators, Henderson only alleges that each comparator violated *one* of those two policies. (Resp., Dkt. 18, at 4). As Oncor suggests, the fact that Henderson allegedly violated *both* of these policies "represents a more serious breach of company policy" and "[t]his cumulative misconduct sets [Henderson's] situation apart from" the identified comparators. (Reply, Dkt. 19, at 5). *See Lee*, 574 F.3d at 260 ("If the difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer, the

employees are not similarly situated for the purposes of an employment discrimination analysis."). *See also Brown v. United Parcel Serv. Inc.*, 238 F. App'x 8, 9–10 (5th Cir. 2007) (finding that while two employees "allegedly engaged in dishonest conduct," the plaintiff's "dishonesty was of a different magnitude," and therefore leading the court to find that plaintiff was not similarly situated to the other employee). Further, the Court also agrees with Oncor's proposition that Henderson has not met his burden to substantially assert that the comparators "performed similar design roles." (Resp., Dkt. 18, at 13). *See Barrera v. MTC, Inc.*, No. SA-10-CV-665-XR, 2012 WL 1202296, at *2 (W.D. Tex. Apr. 10, 2012) ("Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on 'conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence' to create a genuine issue of material fact sufficient to survive summary judgment."). In fact, the deposition excerpts Henderson points to seem to suggest that there are differences in the roles and therefore responsibilities of Brem, Diaz, and Russell as Oncor Designers and Senior Designers as compared to Henderson's duties as a Design Associate. (*See id.* at 13–14). (Reply, Dkt. 19, at 4).

Consequently, Henderson has not met his burden to establish a *prima facie* case of discrimination to defeat Oncor's Motion for Summary Judgment. Therefore, the Court will not reach the parties' arguments as to Oncor's legitimate, non-discriminatory reason for its decision to terminate Henderson nor Henderson's claim of pretext.

### B.  Retaliation Claims

Henderson also brings retaliation claims under Title VII and § 1981. (Compl., Dkt. 1, at 8–9). Title VII's anti-retaliation provision prohibits employers from "discriminat[ing] against" an employee "because he has opposed any practice made an unlawful employment practice" by Title VII or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). Retaliation claims

made under § 1981 are treated the same as Title VII retaliation claims. *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, at *15 (N.D. Tex. Dec. 12, 2008), *aff'd sub nom. Hernandez v. Yellow Transp., Inc.*, 641 F.3d 118 (5th Cir. 2011), *opinion withdrawn and superseded on reh'g*, 670 F.3d 644 (5th Cir. 2012), *and aff'd sub nom. Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644 (5th Cir. 2012). For ease of reference, the court will refer only to Title VII in its analysis of Henderson's retaliation claims, but the reasoning and holdings apply equally to the claims to the extent brought under § 1981. *See Dumas v. Union Pac. R.R. Co.*, 2008 WL 4158736, at *2 n.2 (5th Cir. Sept. 8, 2008) ("When a plaintiff pursues both as parallel causes of action, Title VII and § 1981 require the same proof to establish liability.").

Because Henderson has also only offered circumstantial evidence of retaliation, the Court will similarly apply the modified *McDonnell Douglas* burden-shifting paradigm to his retaliation claims. Under this approach, Henderson must first establish a prima facie case of retaliation by showing that (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link existed between the protected activity and the adverse employment action. *Hernandez v. Metro. Transit Auth. of Harris Cnty.*, 673 F. App'x 414, 419 (5th Cir. 2016). An employee engages in a protected activity by (1) opposing an employment practice made unlawful by Title VII, or (2) by making a charge or testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII. *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). The underlying practice need not actually be illegal, but the employee must at least reasonably believe that it is. *See id.* Plaintiff is required to show that he would not have suffered the adverse employment action but for the protected activity. *See Strong v. Univ. Health Care Sys.*, 482 F.3d 802, 806 (5th Cir.2007).

Once the plaintiff meets his initial burden, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer proffers a legitimate, nondiscriminatory reason, the burden then

13

returns to the plaintiff to prove that the employer's reason is pretext for unlawful discrimination. *See Septimus v. Univ. of Hous.*, 399 F.3d 601, 607 (5th Cir. 2005). At this stage, the plaintiff must present sufficient evidence to create a material fact issue that retaliatory motive was the "but-for cause" of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *see also Coleman v. Jason Pharms.*, 540 F. App'x 302, 304 (5th Cir. 2013) ("An employee establishes pretext by showing that the adverse action would not have occurred 'but for' the employer's retaliatory reason for the action.").

Oncor contends that Henderson's retaliation claims must be dismissed because he "cannot establish that he engaged in protected activity or, even assuming that he did participate in protected activity, establish a causal connection between any alleged protected activity and the termination of his employment." (Mot. Summ. J., Dkt. 16, at 20–21). Oncor maintains that aside from the fact that Plaintiff's termination occurred a couple of months after his alleged complaints, there is no evidence that any adverse employment action resulted because of any alleged protected activity, and "temporal proximity alone is insufficient to establish causation, especially where, as here, there is clear evidence of legitimate, non-retaliatory reasons for the termination." (*Id.* at 21). Henderson responds that he engaged in protected activity based on his complaints of racial discrimination during the meeting with Guadagno, Blakenship, and Barrett on April 19, 2023. (Resp., Dkt. 18, at 20). In that meeting, Henderson alleges that he complained "about preferential treatment and resources given to members of management's family members and 'people that look like ya'll versus me as a black employee." (Henderson Decl., Dkt. 18-1, at 3). Henderson also "complained that [he] felt black-balled and felt like [he] was being isolated from [his] group as a difficult black character." (*Id.*).

14

First, the Court finds that Henderson's sworn testimony suffice to establish that he reasonably believed he was engaging in protected activity opposing an illegal practice.[2] *See Gaspari v. FMC Techs., Inc.*, No. CV H-13-2353, 2016 WL 1055642, at *13 (S.D. Tex. Feb. 4, 2016), *adopted*, 2016 WL 1070859 (S.D. Tex. Mar. 15, 2016) ("Title VII protects only opposition to discrimination based on race, color, religion, sex, or national origin . . . Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue.").

Next, neither party disputes that an adverse employment action occurred—Henderson's termination from Oncor—so Henderson has met his burden for the second prong of a *prima facie* case of retaliation. "Termination constitutes an adverse employment action." *Roberts v. Lubrizol Corp.*, No. CV 4:12-3272, 2014 WL 12528004, at *8 (S.D. Tex. Mar. 5, 2014), *aff'd*, 582 F. App'x 455 (5th Cir. 2014) (citing *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013)). Finally, the parties contest whether a causal link existed between the protected activity and Henderson's adverse employment action. Henderson argues that "the causal link is satisfied by the close temporal proximity of two months between Henderson's complaint of racial discrimination and his discharge," which he claims is sufficient at the *prima facie* stage. (Resp., Dkt. 18, at 20). The Court agrees with Henderson that the Fifth Circuit has previously held that "a period of two months is close enough to show a causal connection" to establish a *prima facie* case of retaliation. *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (citing *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994–95 (5th Cir. 2005)).

---

[2] Despite Oncor's denial of Henderson's alleged statements during the April 19, 2023 meeting, (Mot. Summ. J., Dkt. 16, at 7), when reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. As such, the Court proceeds with its analysis of Henderson's *prima facie* case of retaliation.

As such, the Court concludes Henderson established a *prima facie* case of retaliation. At the next stage of the *McDonnell Douglas* framework, however, Oncor has presented a legitimate, non-retaliatory reason for Henderson's termination—that he violated both Oncor's Work Hours and Pay Policy and Code of Conduct by taking vacation without supervisor approval and providing false information during a company investigation, respectively. (Mot. Summ. J., Dkt. 16, at 11). Henderson proceeds to present various arguments to attempt to prove that Oncor's reason for his termination is pretext, but those arguments fail because they do not prove "that [Oncor's] desire to retaliate was the but-for cause" of his challenged termination, as required by Fifth Circuit case law.[3] *See Coleman*, 540 F. App'x at 304. *See also Garcia*, 938 F.3d at 243 (finding that temporal proximity "gets [plaintiff] through his prima facie case but does not, on its own, establish that the [defendant] company's stated explanation for Garcia's firing was mere pretext"); *United States ex rel King v. Solvay Pharms., Inc.*, 871 F.3d 318, 334 (5th Cir. 2017) (holding that evidence of temporal proximity combined with positive performance reviews was not enough to create an issue of fact regarding pretext). Given that in between Henderson's alleged protected activity on April 19, 2023, and his termination on June 2, 2023, Oncor purports that Henderson violated two of its company policies, that independent event breaks any potential causal link that could exist due to temporal proximity alone.

As Oncor points out in its Reply, Henderson is aware that he violated Oncor's policies, which "alone could form a lawful basis for [his] termination."[4] *See Kopszywa v. Home Depot USA, Inc.*,

---

[3] The Court agrees with Oncor that Henderson's co-worker James Chrisman's testimony that "it was obvious that [Henderson] was being targeted [after his complaint in April 2024] and that Oncor retaliated against him" is not competent summary judgment evidence. *Vance v. N. Panola Sch. Dist.*, 189 F.3d 470, 1 (5th Cir. 1999) (in considering an appeal of a district court's grant of summary judgment, affirming that court's refusal to admit lay opinion testimony for containing "hearsay and speculation by [the lay witness] and several other people as to why the plaintiff was fired" because "none of the people mentioned in the [lay witness's] affidavit were involved in any way in the decision to terminate the plaintiff.").

[4] As described in the Background section of this order, Henderson contends that he "spoke with Barrett who explicitly approved his vacation dates." (Resp., Dkt. 18, at 8). The Court finds that with Oncor's evidence of

620 F. App'x 275, 279 (5th Cir. 2015). Although Henderson contests certain components of Oncor's investigation into his Costa Rica trip, (Resp., Dkt. 18, at 21–22), "a fired employee's actual innocence of h[er] employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted on it in good faith." *Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 10 (5th Cir. 2009) (citing *Waggoner v. City of Garland*, 987 F.2d 1160, 1165 (5th Cir. 1993)). *See Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (stating that "even an incorrect belief that an employee's performance is inadequate" is a legitimate reason); *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (finding that in conducting a pretext analysis, "a reviewing court is not to engage in second-guessing of an employer's business decisions" and that "[s]imply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext" (citations omitted)). The Court finds that Oncor has articulated rational reasons for Henderson's termination and demonstrated a good faith process behind its investigation into Henderson's alleged Oncor policy violations. (Mot. Summ. J., Dkt. 16, at 17–18; Reply, Dkt. 19, at 5–10). *See Vance*, 189 F.3d at 1 ("Where the reasons articulated for termination are rational ones (as opposed to frivolous or capricious reasons) whose objective truth is not seriously disputed, it is difficult to carry the burden of establishing them as pretextual, even in a summary judgment context.").

Further, the Court finds that the messages between Oncor's management pertaining to Henderson's Costa Rica trip before the formal investigation began do not expose any retaliatory animus sufficient to raise a genuine issue of fact regarding pretext, as Henderson argues. (Resp., Dkt. 18, at 10). *See Stewart v. Houston Lighting & Power Co.*, 998 F. Supp. 746, 751 (S.D. Tex. 1998) ("Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be

---

two emails from Henderson in which he "acknowledged that he 'proceeded with a three-day vacation without direct supervisor approval' and conceded that 'his lack of action' jeopardized his career at Oncor," (Reply, Dkt. 19, at 8 (citing Knight Aff., at App. 022–003; Ex. 1-S, at App. 099–100; Ex. 1-2, at App. 107–108)), "no reasonable juror could find for" Henderson on this issue. *Miss. River Basin All.*, 230 F.3d at 175.

established by mere conclusory statements of a plaintiff who feels that she has been discriminated against.") (first citing *Britt v. Grocers Supply Co.,* 978 F.2d 1441, 1451 (5th Cir. 1992); and then citing *E.E.O.C v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984)). Accordingly, Henderson has failed to show that a reasonable jury could conclude that his alleged complaints of racial discrimination were the but-for cause of his termination. Therefore, Oncor is entitled to summary judgment on this claim.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Oncor's Motion for Summary Judgment, (Dkt. 16), is **GRANTED**. Oncor is entitled to summary judgment as to all of Henderson's claims against it.

Final judgment will be entered in a separate order.

**SIGNED** on April 17, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

18